[No. 20203. Department One. May 10, 1927.]

## S. GILPATRICK, *Respondent*, v. R. E. DOWNIE *et al.,* *Appellants.*[1]

[1] SALES (3, 108) — CONTRACTS FOR MANUFACTURE — IMPLIED WARRANTY—FITNESS FOR PURPOSE INTENDED. Where cedar poles were purchased by a trader for resale for use as telegraph or telephone poles, of one who agreed to cut, prepare and deliver them, the obligation was to deliver poles free from latent defects, notwithstanding prior reasonable inspection which could not disclose the defects, as in the case of a manufacture of articles for a specific use; and the poles being infected with teredo and useless, the loss must fall upon the vendor (FRENCH, J., dissenting).

[2] SALES (23)—EXECUTION OF CONTRACT—EVIDENCE — SUFFICIENCY. Findings of a sale of piling by plaintiff to defendant are sustained, where, on an issue as to whether the sale had been made by one H., it appears that such claim was not made by defendant when personally dunned for the price, and that H. and his wife had no interest in the sale, but were acting for and as an accommodation to the defendant, then temporarily absent from the state.

Appeal from a judgment of the superior court for King county, Moriarty, J., entered May 15, 1926, upon findings in favor of the plaintiff, in an action on contract, tried to the court. Reversed in part and affirmed in part.

*Wright, Froude, Allen & Hilen,* for appellants.

*Vince H. Faben* and *Henry Gulliksen,* for respondent.

MITCHELL, J.—Respondent Gilpatrick brought this action to recover the balance due on the purchase price of cedar poles and fir piling sold and delivered to the appellant Downie during the summer of 1925. The agreed price of the poles was $1,095 on which the complaint admitted a payment of $1,000. The price of the piling was $3,256.12. The answer admitted the sale of

[1]Reported in 255 Pac. 1028.

the cedar poles at the price mentioned, against which there was a cross-complaint in damages in the sum of $750, because to that extent they were unfit for market or use on account of ruin by teredos. The answer denied purchasing the piling from the respondent and alleged it was bought from one Humphrey. There was no dispute as to the value of the piling.

Upon the trial of the case without a jury, findings of fact and judgment were entered for the plaintiff, respondent, in the full amount demanded in the complaint. The appeal is from that judgment.

[1] As to the poles, the court found that, at the time of the sale, both parties were without knowledge of any defect in them

" . . . and that after delivery as aforesaid the defendant discovered that forty per cent of said cedar poles were teredo eaten and unsalable, which was a latent defect."

To this finding, no exception was taken. The evidence showed that cedar poles have a special meaning to the trade. They are used for telephone, telegraph and electric light poles. The sizes, dimensions and specifications are all covered by the rules of the Washington Red Cedar Association. They are sold on the market. The respondent, who has been engaged in the logging business for more than thirty years, knew that the appellant was buying the poles for resale, as a trader. He had them cut in the woods, trimmed, peeled and ready for use. The dimensions were according to the rules of the association. Poles injured as these were will not be used. They are valueless.

Appellant had inspected the poles, but there is no dispute of the fact that he did not, nor could he by any reasonable inspection, discover their latent defect.

Respondent contends that, by the acceptance of the poles, the purchase was complete and that, under the rule of *caveat emptor,* the purchaser must pay. That rule would apply in the case of a trader selling to another in the absence of an express warranty, but not in a case such as this. It makes no difference whether it be called condition broken or implied warranty, the obligation rests upon this kind of a vendor not to deliver such goods with latent defects, notwithstanding prior reasonable inspection. Here the vendor took the tree standing in the forest, handled, altered and improved it until it was another thing complete and ready for use. Within this division of the law, his position was in the nature of a manufacturer rather than a trader.

In *Ketchum v. Stetson & Post Mill Co.,* 33 Wash. 92, 73 Pac. 1127, one Purdy had cut, sold and delivered saw logs to Ketchum who sold them to the mill company. Ketchum sued the mill company for the purchase price. The mill company claimed damages caused by a latent defect in the logs, known to neither of the parties. In the opinion in that case the court stated:

"The question for solution is, can a vendor, who is not the manufacturer of a given commodity, be held responsible for a latent defect therein, under the testimony as presented by the record in this cause?"

The court held that such a vendor could not be held, in the absence of an express warranty. But here the vendor was not so situated. He took the natural trees and, by his labor and the ordinary processes, converted them into articles ready for use. The poles were inspected and purchased on August 6. At the trial, an expert witness of very considerable experience, against whose qualification not the slightest objection was

raised, after a thorough examination of the poles testified that he did not think it possible for them to have become as defective after August 5 as he found them. There appears no direct testimony to the contrary, which manifestly accounts for the fact that, in the findings and conclusions signed by the trial judge, there had been written the words

" . . . and if any defects or impairment there were in the merchandise it arose subsequent to the sale"

were crossed out, as the same appears upon the face of the findings and conclusions.

It must, therefore, be taken as proven that, to the extent found by the trial court, the poles were, at the time of the purchase, unfit for sale and that the vendor, not being a trader but the one who produced them for sale, must bear the loss. On this branch of the case the appellant was entitled to recover $343—the difference between sixty per cent of the sale price of $1,095 and the $1,000 he had paid.

[2] On the other branch of the case, we are satisfied that the findings and judgment are supported by a preponderance of the evidence. The piling were secured and delivered at the respondent's booming ground. Commencing in February that year, respondent cut and in April delivered at his booming ground to the appellant a raft of piling that was paid for. At that time there were cut out of the lot seventy or eighty sticks appellant did not want. Then in August (the respondent being out of the state all that month), when appellant inspected the cedar poles, he asked respondent's son, present, who had been left in charge by the respondent, about getting more piling. The son called his attention to the sticks left over from the raft in April. Thereupon they agreed upon a price to be paid

for piling according to lengths, and appellant inspected the pieces referred to that had been left from the other raft and selected some forty-two of them, with the understanding that other piling should be procured and added. Other piling was added and all together were delivered by the son at this same boom ground of the respondent. This is the raft of piling involved in this controversy. True, the testimony shows a letter from Mr. Humphrey written by his wife to the appellant about the piling, but it contains nothing justifying the claim that Mr. Humphrey was claiming to be the owner of the piling or pretending to sell it as his own. It was in the nature of accommodation advice as to just when the raft could be made up and the number of chains necessary in fastening it together for towing. She also telephoned him about it. The telephoning and writing were done, it appears, by her because telephone communication was with the camp in the woods where Mrs. Humphrey stayed. She testified that, upon his inquiry prior to delivery of the piling, she told him that they, Mr. Humphrey and herself, had absolutely nothing to do with the piling. Still later, just before this suit was started, the appellant, upon being dunned personally by the respondent for pay for the piling, made no claim whatever that the purchase had not been made from him. Upon the whole record, it is manifest that whatever Mr. and Mrs. Humphrey and respondent's son did about the sale and delivery of the piling was as employes or agents for the respondent in getting it out and selling it.

Reversed, and remanded with directions to modify the judgment as herein directed as to the cedar poles; affirmed as to the sale of the piling.

MACKINTOSH, C. J., FULLERTON, and MAIN, JJ., concur.

FRENCH, J. (dissenting)—I am unable to reach the conclusion stated in the majority opinion. The vendor cut these poles and placed them in the waters of Hoods Canal. There they were inspected by the purchaser before the contract of sale was made.

The defect complained of was that the poles were infected with teredos. This is not, in my opinion, a latent defect as the term is used in the text-books and adjudicated cases. It is rather one of the perils that beset transportation of timber in the waters of Puget Sound. There is no contention that these poles were defective in any other particular. They were fresh cut, were in the water but a short time, and the danger of their becoming infected with teredos was as apparent to the vendee as it was to the vendor.

I think that the rule should be that the purchaser of logs, piles, poles, or other timber products located in salt water, having full opportunity for inspection such as was made in this case, there being no misrepresentation as to the time such timber was placed in the water, assumes the risk of their becoming teredo infected, the danger being apparent.

I therefore dissent.